IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BANCO DELTA ASIA, S.A.R.L., Largo de
Santo Agostinho, Macau; and

DELTA ASIA GROUP (HOLDINGS) LTD.,
5/F. Luk Kwok Tower, Wanchai, Hong Kong,
and

STANLEY AU, Flat D, 5/F Woodland
Gardens, 62, Conduit Road, Hong Kong,

      Plaintiffs,

      v.

FINANCIAL CRIMES ENFORCEMENT
NETWORK and JENNIFER SHASKY
CALVERY, in her official capacity as
Director, Financial Crimes Enforcement
Network, 2070 Chain Bridge Road, Vienna,
VA 22182; and

TREASURY DEPARTMENT and JACOB J.
LEW, in his official capacity as Secretary of
the Treasury, 1500 Pennsylvania Avenue,
N.W., Washington, DC 20220,

      Defendants.

## COMPLAINT

Plaintiffs bring this civil action under the Administrative Procedure Act against the

Financial Crimes Enforcement Network ("FinCEN"), Jennifer Shasky Calvery, in her official

capacity as Director of FinCEN, the United States Department of the Treasury, and Jacob Lew,

in his official capacity as Secretary of the Treasury.

## NATURE OF THE ACTION

1.      This action seeks review under the Administrative Procedure Act of 31 C.F.R.

§ 103.193, a final rule promulgated by FinCEN pursuant to Section 311 of the USA PATRIOT

Act, 31 U.S.C. § 5318A, imposing a special measure against Banco Delta Asia, S.A.R.L. ("the

Final Rule").

2.      The Final Rule was promulgated by FinCEN without statutorily or

constitutionally adequate procedure, without adequate evidentiary support, and based on

improper considerations.  As a result, the rulemaking challenged here was arbitrary, capricious,

an abuse of discretion, and otherwise not in accordance with law; in excess of statutory

jurisdiction, authority or limitations, or short of statutory right; contrary to constitutional right,

power, privilege, or immunity; and made without observance of procedure required by law in

violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

3.      In addition, Section 311 fails to provide adequate specificity as to the criteria for

designating a financial institution as being "of primary money laundering concern" and for the

imposition of special measures, and it provides Executive Branch officials overly broad

discretion in making those determinations.  As a result, Section 311 violates the Constitution's

Due Process Clause and is an unconstitutional delegation of legislative authority, thus rendering

the Final Rule invalid.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question) and 5 U.S.C. § 702 (waiver of sovereign immunity).

5.      Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

6.      Plaintiff Banco Delta Asia ("BDA") is a small commercial bank located and licensed in the Macau Special Administrative Region of the People's Republic of China.

7.      Plaintiff Delta Asia Group (Holdings) Ltd. ("Delta Asia Group") is a holding company which owns BDA and a group of affiliated banking and financial services companies operating in Macau, Hong Kong, China, and Japan.

8.      Plaintiff Stanley Au is a resident of Hong Kong and Macau.  He is  Chairman of Delta Asia Group and BDA, and a representative of the shareholders of the Au Family Continuation Limited, which owns Delta Asia Group.  Mr. Au has worked in the financial industry for more than fifty years, and has repeatedly been recognized for his substantial contributions to the business and civic life of Macau.

9.      Defendant Department of the Treasury is an executive department administered by Secretary Jack Lew, with responsibility for regulating U.S. financial institutions under the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*  The Department's headquarters are located at 1500 Pennsylvania Avenue, N.W., Washington, DC 20220.

10.     Defendant Jacob Lew is the Secretary of the Treasury and is responsible for carrying out the powers delegated to the Department by the Bank Secrecy Act.  Secretary Lew executes the Bank Secrecy Act through a delegation of authority to FinCEN.  *See* 31 U.S.C. § 310; Treasury Order 180–01 (Mar. 24, 2003).  Mr. Lew is sued in his official capacity.

11.     Defendant FinCEN is a bureau within the Department of the Treasury responsible for regulating U.S. financial institutions under the Bank Secrecy Act.  FinCEN has its principal office at 2070 Chain Bridge Road, Vienna, VA 22182.

12.     Defendant Jennifer Shasky Calvery is the Director of FinCEN, with responsibility for executing the Bank Secrecy Act.  Ms. Shasky Calvery is sued in her official capacity.

## STATEMENT OF FACTS

### A.     The Statutory Scheme

13.     As part of the USA PATRIOT Act, passed on October 26, 2001, Congress enacted the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 (the "Act").  Among the purposes of the Act were to "to provide the Secretary of the Treasury . . . with broad discretion, subject to the safeguards provided by the Administrative Procedure Act under title 5, United States Code, to take measures tailored to the particular money laundering problems presented by specific foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts" and "to ensure that the employment of such measures by the Secretary permits appropriate opportunity for comment by affected financial institutions."  31 U.S.C. § 5311 note.

14.     Section 311 of the Act amended the Bank Secrecy Act by inserting as 31 U.S.C. § 5318A a provision entitled "Special measures for jurisdictions, financial institutions, international transactions, or types of accounts of primary money laundering concern."  This section allows the Secretary to promulgate rules that impose "special measures" against those jurisdictions or entities which he finds to be "of primary money laundering concern."  31 U.S.C. § 5318A(a)(1).  The fifth and most severe special measure set forth in the statute authorizes the Secretary to prohibit banks operating in the United States from opening or maintaining a correspondent account on behalf of the entity found to be of primary money laundering concern. The immediate legal effect of imposing the fifth special measure is to cut a foreign financial institution off from all ties to the U.S. banking system; the practical effect is to cut it off from the worldwide banking system.

15.     Before adopting a special measure, the Secretary must find that "reasonable grounds exist for concluding" that the jurisdiction or entity is "of primary money laundering concern."  The Act does not define "of primary money laundering concern" or set forth any objective standards by which the Secretary is to determine that such "reasonable grounds exist." Rather, the Act specifies that the Secretary shall consult with the Secretary of State and the Attorney General, and shall consider "such information as the Secretary determines to be relevant," which may include the extent to which the financial institution is used to facilitate or promote money laundering, the extent to which the financial institution is used for legitimate business purposes, and the extent to which a special measure will guard against international money laundering and other financial crimes.

16.     Prior to September 2005, FinCEN had issued a Final Rule imposing the fifth special measure under Section 311 on only one occasion:  in April 2004, on the country of Burma and two Burmese banks.  The targets of that action had substantial advance notice of U.S. government and international concerns regarding the lack of basic anti-money laundering controls in Burma.  In June 2001, the Financial Action Task Force ("FATF"), an independent intergovernmental body that develops policies to protect the global financial system, designated Burma as a Non-Cooperative Country and Territory ("NCCT"), resulting in FATF members issuing advisories to their financial sectors recommending enhanced scrutiny of transactions involving Burmese financial institutions.  In April 2002, nineteen months before issuing the proposed rule against financial dealings with Burma and the two banks, FinCEN issued an advisory notifying U.S. financial institutions that they should accord enhanced scrutiny with respect to transactions and accounts involving Burma.  And in July 2003, the U.S. government issued Executive Order 13310 broadly prohibiting the provision of financial services to Burma.

Thus, when Section 311 measures were proposed in November 2003 and made final in April 2004, they had minimal impact, as they were redundant of measures already in effect.

**B.    Banco Delta Asia**

17.    Banco Delta Asia is a family-owned commercial bank that was established by Mr. Au's father in 1935.  Although small by comparison to the larger multinational banks in the region, prior to September 2005 it had a significant presence in Macau and offered a broad range of services, including trade financing, foreign exchange, investment banking, and retail banking. Indeed, just prior to the events described herein, BDA had assets of more than $450 million, approximately 200 employees, and over 40,000 individual retail accounts in a jurisdiction with a population of approximately 500,000.  At that time, BDA maintained correspondent accounts in the United States.

18.    Historically, BDA has declined on principle to provide corporate banking services to Macau's casino operators, themselves a potential source of illicit financial dealings, and that prohibition has continued notwithstanding the substantial growth of the casino sector in Macau over the past decade.

19.    Macau had historic ties to the People's Democratic Republic of Korea ("North Korea"), and BDA, like many other banks in Macau, historically had relationships with a number of North Korean banks and other customers with ties to that country.  In 2005, such North Korean–related business generated only a small part of BDA's overall revenue, estimated at no more than 7%.  Since September 2005, BDA has done no business with North Korean customers.

**C.    U.S. Relations with North Korea**

20.    The United States, the United Nations, and others have long sought to prevent the North Korean government from acquiring nuclear weapons.  According to published reports, there was significant debate within the administration of President George W. Bush over whether

that could best be achieved by confrontation and isolation or by engagement, and over whether increased pressure on North Korea's government would result in regime change.  There was also serious disagreement within the Administration about whether and to what extent the North Korean government was then engaged in criminal activity, including money laundering and counterfeiting.

21.     Although broad sanctions have been imposed against various North Korean persons in recent years, there were few restrictions in September 2005 on U.S. financial institutions doing business generally with North Korean banks or customers.  In fact, since 1995, U.S. financial institutions have been expressly authorized under 31 C.F.R. § 500.580 to "process the transfer of funds in which North Korea or a national thereof has an interest."

22.     The U.S. sanctions that were in effect in 2005 generally targeted specifically identified North Korean persons involved in the proliferation of weapons of mass destruction.  BDA, although not subject to U.S. regulations, relied on and sought to comply with published blacklists issued by the United Nations and the U.S. government.  Thus, for example, BDA voluntarily discontinued doing business with one North Korean bank in summer 2005 when it discovered that the United States had recently blacklisted it.

23.     At no time, either prior to September 2005 or thereafter, has the Department of the Treasury exercised its authority under Section 311 to designate the country of North Korea or any North Korean financial institution, as being "of primary money laundering concern."  At no time, either prior to September 2005 or to the present, has the Department of the Treasury proposed to impose the fifth special measure under Section 311 on North Korea or on any North Korean financial institution.  Moreover, at no time prior to September 2005 did the Department of the Treasury issue any public warning, whether to U.S. banks or to BDA, that banks were at

risk of being designated as "of primary money laundering concern" if they did business generally with North Korean banks or customers, as they were expressly authorized to do by 31 C.F.R. § 500.580.  Nor, prior to September 2005, did FinCEN or FATF issue advisories warning financial institutions to subject North Korean accounts to enhanced scrutiny.  The first such advisories were issued by FinCEN in December 2005 and by FATF in 2010.

24.     On information and belief, certain members of the Bush Administration, who sought to isolate and increase the pressure on North Korea rather than to engage with it, developed a plan to accomplish indirectly what they were not willing or able to do directly. They concluded that they could scare the global financial community into refusing to deal with North Korean banks and customers by singling out one small bank with North Korean customers for a Section 311 designation.  As Deputy Assistant Secretary Daniel Glaser later testified before Congress, "essentially North Korea was frozen out of the international financial system.  It was a sort of a 'shot heard 'round the world' for national bankers who cut off relations with North Korea, fearing that something like what happened to BDA could happen to them."

25.     On information and belief, BDA was chosen as the principal target for this strategy because of its small size and its location in a jurisdiction that was not considered strategic.  David Asher, a State Department official who helped formulate the North Korean financial strategy, confirmed that BDA "had never been the main offender in Macao."  Donald Greenlees & David Lange, *The Money Trail That Linked North Korea to Macao*, N.Y. Times, Apr. 11, 2007.  To the contrary, the United States had allegedly uncovered "voluminous" evidence of North Korean money laundering at other banks, but chose BDA for sanctions because it was "an easy target in the sense that it was not so large that its failure would bring down the financial system."  *Id.*  According to Mr. Asher, "Banco Delta Asia may be a sacrificial

lamb in some people's minds, but it is not about Banco Delta." *Id.* Rather, as Mr. Asher

testified before Congress, "Banco Delta was a symbolic target. We were trying to kill the

chicken to scare the monkeys, and the monkeys were big Chinese banks doing business in North

Korea, and we are not talking about tens of millions [of dollars]. We are talking about hundreds

of millions of dollars."

### D.     FinCEN's Finding and Notice of Proposed Rulemaking

26.     To accomplish that goal, on September 20, 2005, FinCEN published a Finding

that reasonable grounds existed for concluding that BDA was a financial institution of primary

money laundering concern. *See* 70 Fed. Reg. 55,214 (Sept. 20, 2005). At the same time,

FinCEN published a Notice of Proposed Rulemaking, which proposed prohibiting covered

financial institutions from directly or indirectly opening or maintaining correspondent accounts

in the United States for BDA or any of its branches, offices, or subsidiaries. *See* 70 Fed. Reg.

55,217 (Sept. 20, 2005). In promulgating the Finding and Notice of Proposed Rulemaking

(collectively, the "Rulemaking Documents"), FinCEN invoked its authority under § 5318A.

27.     The stated basis for the Finding was that North Korea used Macau as a base of

operations for money laundering and other illegal activities, that Macau had inadequate anti-

money laundering controls and regulatory oversight of the banking and gaming industries, and

that BDA did business with a number of customers with North Korean ties, including with

several North Korean banks. FinCEN did not designate the country of North Korea or any of the

North Korean banks as being "of primary money laundering concern," notwithstanding

FinCEN's claim that it was these North Korean customers who were active participants in money

laundering and other crimes.

28.     Without identifying specific names, dates, or sources, FinCEN stated in the

Finding that BDA had allowed North Korea to access the banking system for a fee; that senior

officials at BDA were working with North Korean officials to accept and place into circulation

counterfeit U.S. currency; that BDA had maintained a relationship with one well-known North

Korean front company after that company had been found by BDA to have attempted to deposit

counterfeit funds; that BDA facilitated several multi-million dollar wire transfers connected with

unspecified criminal activity on behalf of another unidentified North Korean front company; and

that BDA serviced the account of "a known international drug trafficker," whose identity

FinCEN declined to reveal.  70 Fed. Reg. at 55,215–16.

29.     Prior to issuing the Finding, FinCEN provided no notice to BDA that it had any

concerns about its dealings with North Korean customers.  Nor did FinCEN raise its concerns

with the Macau authorities or give them an opportunity to address them.

30.     The substantive merits of FinCEN's allegations against BDA provoked extensive

controversy, even within the Bush Administration.  According to one journalist and author,

"[n]ot everyone in the bureaucracy . . . was convinced that the evidence against BDA was strong

enough to hold up . . . .  The skeptics included virtually all the State Department's leading Korea

experts . . . ."  Mike Chinoy, *Meltdown* 258 (2008).  "The[se] skeptics repeatedly asked for

details of the intelligence to substantiate the claims Treasury was making about BDA, but

remained dissatisfied with what they were told. . . .  [T]he skeptics argued the evidence of money

laundering and counterfeiting [at BDA]—particularly of taking counterfeit funds and introducing

them into the financial system—didn't add up.  'It was just like the weapons in Iraq,' said one

critic.  'They weren't there.'"  *Id.*

31.     Indeed, based on information and belief, the allegation of facilitating

counterfeiting related to an event that had occurred *eleven years earlier*, in 1994, when BDA

discovered and reported to authorities that counterfeit money had been deposited in certain

accounts.  BDA fully cooperated with the investigation of the incident by Macau and U.S. authorities, and it closed the accounts of two of the customers involved in the activity.  A third customer adamantly denied any knowledge of the counterfeit nature of the funds and BDA had no evidence to the contrary.  BDA agreed — with full knowledge of the authorities — to permit the customer to retain its account but warned the customer that all business dealings would be cut off if counterfeit currency was ever again deposited into the account.  At the same time, BDA adopted more sophisticated technology to screen wholesale deposits.  Between 1994 and 2005, there was no evidence of any further counterfeit funds being deposited in the account.

32.     During the course of the 1994 investigation described above, Mr. Au specifically asked U.S. government investigators whether they wanted BDA to end its relationships with North Korean customers.  The investigators told Mr. Au that they preferred that the bank continue those relationships because of its demonstrated willingness to cooperate with U.S. authorities in any investigations.  Yet, eleven years later, FinCEN claimed that its previously undisclosed "concern" about such relationships warranted designating BDA under Section 311.

**E.     The Response to the Finding**

33.     The effect of the announcement of the Finding was immediate.  Although the fifth special measure was at that point only proposed, and did not ultimately go into effect until April 2007, U.S. banks immediately closed correspondent accounts with BDA.  With the express encouragement of FinCEN, non-U.S. banks also cut off ties, fearing that they too could be subject to Section 311 sanctions if they continued to do business with BDA.  As a result, BDA lost its trade finance and foreign exchange businesses as well as the accounts of any customers whose business required the ability to wire funds.

34.     The announcement of the Finding also caused a severe run on the bank which threatened its very existence.  Within days, about $133 million in deposits were withdrawn.  To

stabilize the bank, BDA's owners and board of directors invited the Macau government to assume temporary responsibility for management of the bank.  The Macau government designated a three-person Administrative Committee to exercise managerial control on a temporary basis.

35.     As FinCEN had hoped, dozens of banks around the world also cut off or significantly restricted their relationships with North Korean customers.  Senior Treasury officials, including Undersecretary Stuart Levey, reportedly visited banks in China, Hong Kong, Macau, South Korea, and Vietnam, advising them of the risks of doing *any* business with North Korea, and asserting publicly that it was "almost impossible to distinguish between the North's legitimate and illegitimate dealings."  As reported in *Meltdown*, banks around the world were "fearful that any association, however legitimate, carried the risk of being tainted with U.S. accusations of complicity in illicit activities and being shut out of the American financial system. American officials openly encouraged this trend. . . .  To leading hard-liners the financial pressure appeared to be proving far more effective than anyone had dreamed, reigniting hopes that it could become a weapon to produce a change of regime."  Chinoy, *supra*, at 265–66.

36.     BDA took immediate concrete steps to address any concerns about its relationship with North Korean customers or its vulnerability to money laundering.  BDA froze and ultimately terminated all accounts with North Korean customers and other customers whose principal business was with North Korean entities.  This effectively closed the accounts of approximately fifty entities, including twenty North Korean banks, eleven North Korean trading companies, and nine North Korean citizens.  Since these accounts were frozen in 2005, BDA has not provided any financial services to North Korean customers.

37.     Ernst & Young Transactions Limited was retained to conduct a review of BDA's North Korean–related business, internal controls, corporate-governance standards, and related matters.  That review concluded, among other things, that (i) BDA's procedures for handling wholesale deposits of U.S. currency ensured that, to a material degree, the Bank did not introduce counterfeit U.S. currency notes into circulation, and (ii) BDA's anti-money laundering ("AML") programs and controls needed improvement, but that there was no evidence that BDA had knowingly participated in money laundering or other illicit activities.

38.     Deloitte Touche Tomatsu was also retained to advise on upgrading the bank's AML system and procedures.  Deloitte submitted two reports that served as the basis for the implementation of a new AML program.  This new AML program has in recent years been evaluated as effective by KPMG in a Thematic Review organized by the Macau Monetary Authority.

39.     BDA sought repeatedly to get details about the specific customers, accounts, or transactions that FinCEN claimed involved illicit activity, or about the specific actions FinCEN would require to avoid imposition of the fifth special measure.  FinCEN refused to provide any meaningful response.

40.     Regulatory authorities in Macau and Hong Kong also conducted investigations of the activities of BDA and its Hong Kong–based credit subsidiary.  FinCEN was informed that neither the Macau Monetary Authority nor the Hong Kong Monetary Authority had found any evidence that BDA had knowingly accepted counterfeit funds or was otherwise engaged in illicit activities.  Neither BDA nor any of its employees has ever been charged with criminal wrongdoing as a consequence of these investigations.

41.     The Macau authorities also permitted U.S. Treasury investigators to copy more than 200,000 pages of BDA records so that they could fully investigate whether there was any factual basis for the vague allegations in the Finding.  Notwithstanding the passage of seven years, the U.S. government has not brought criminal charges against BDA or any of its owners or employees, nor to BDA's knowledge has it criminally charged any North Korean customer with money laundering or counterfeiting involving accounts at BDA.  By contrast, a few months before FinCEN singled BDA out in the Finding, the U.S. government brought money laundering indictments against dozens of individuals who are alleged to have laundered money through other banks in China and Macao, none of which has been subject to Section 311 designations.

42.     In Spring 2007, the U.S. government agreed to and, through the Federal Reserve Bank of New York, ultimately facilitated the release and return to North Korea of approximately $23 million of funds in the BDA accounts that had been frozen in September 2005.  These were the same accounts that had been cited as the basis for the Finding that BDA was facilitating illicit activities on behalf of North Korean customers.  On information and belief, the U.S. government would not have facilitated the return of those funds if it had evidence demonstrating that they were in fact the proceeds of criminal activity.  In fact, a State Department representative testifying before Congress in April 2007 refused to characterize the funds as "ill-gotten gains." And according to a State Department cable, on or about June 18, 2007, the U.S. government assured the Russian Federation, the Bank of Russia and the Far Eastern Commercial Bank that their assistance in returning the funds to a North Korean bank did "not violate any U.S. law" "including without limitation any U.S. anti-money laundering and anti-terrorist financing laws and regulations . . . and any other U.S. laws relating to sanctions, money laundering, terrorist financing or fraud."  Both media reports and internal State Department cables further

acknowledge that large portions of the frozen funds in the BDA accounts of North Korean banks belonged to non-Korean companies such as British American Tobacco and international organizations that were providing humanitarian services in North Korea.

43.     As reported in *Meltdown*, this lack of evidence of wrongdoing by BDA "dovetailed with [the conclusion] reached by those in the administration who had been skeptical of the push against BDA all along. 'There was nothing they could present to the Macau authorities that could substantiate that these accounts were involved in illicit activities,' recalled a former high-ranking State Department official who worked on the issue. 'Believe me, particularly after we had seized the accounts and had a chance to go through some of the receipts, if there had been evidence of massive money laundering of, for example, profits from missiles or drugs or any other kind of sales, you could be sure it would all be in the public arena right now.'" Chinoy, *supra*, at 314.

### F.     The Final Rule

44.     Notwithstanding BDA's efforts to address FinCEN's stated concerns, FinCEN on March 19, 2007, published the Final Rule designating BDA as a financial institution of primary money laundering concern and imposing the fifth special measure on BDA. *See* 72 Fed. Reg. 12,730, 12,739 (Mar. 19, 2007), codified at 31 C.F.R. § 103.193. By that time, most banks in the U.S. and abroad had long since closed their correspondent account relationships and BDA had already suffered severe damage. The Final Rule was issued on the same day that the Treasury Department announced that the U.S. government had reached "an understanding" with the government of North Korea to permit the return of North Korean funds frozen at BDA.

45.     In the preamble to the Final Rule, FinCEN acknowledged that Macau authorities "have taken a number of additional important steps since the September 2005 Notice of Proposed Rulemaking . . . to address the reported money laundering risks and systemic vulnerabilities."

72 Fed. Reg. at 12,732.  These steps included the enactment of stricter criminal laws against

money laundering, the promulgation of strong anti-money laundering regulations enforceable by

agencies and backed by fines, the establishment of an official financial intelligence unit and a

special investigative agency dedicated to financial crimes, and the undertaking of a study aimed

at addressing cross-border currency movements.  *Id.* at 12,732–33.

46.     FinCEN also noted the above-described remedial actions at BDA, but

nevertheless expressed "serious concerns regarding the bank's potential to be used, wittingly or

unwittingly, for illicit purposes."  *Id.* at 12,733.  These concerns were based "in part" on

"classified sources" and "primarily from an independent review by a large international

accounting firm" (presumably referring to the Ernst & Young review) and "a separate U.S.

Government review of Banco Delta Asia documentation, including that used to conduct the

independent review."  *Id.* at 12,733 n.22.  FinCEN did not identify any specific transaction or

account that provided a basis for these purported "concerns" and, as noted above, the Ernst &

Young report refuted FinCEN's allegations that BDA had knowingly been involved in

counterfeiting or money laundering.

47.     FinCEN also reiterated concerns about the AML controls in place "[p]rior to" the

remedial steps described above, as well as the concerns it had about the "historical activity" at

BDA and unspecified "unusual or deceptive financial practices by North Korean–related

entities," none of which were at that time (or since then) customers of BDA.  *Id.* at 12,734.

FinCEN also asserted that the bank's management had been overly dismissive of FinCEN's

concerns and the threats posed by North Korea "[e]ven after [the] finding of primary money

laundering concern," but pointed only to a press account of a statement purportedly made by a

senior bank official in the days immediately following the announcement of the Finding

"assur[ing] the public that Banco Delta Asia's cessation of business with North Korean accountholders was only a temporary measure to resolve the bank's dispute with FinCEN." *Id.* at 12,734–35. FinCEN had made no effort to determine BDA's true intent and instead purposely distorted and took out of context a statement made by a non-native-English speaker about the immediate measures the bank had taken pending further consultation with Macau authorities about how to respond to FinCEN's allegations. As described above, all North Korean–related accounts remained closed at the time of the Final Rule and, in fact, to the present. Moreover, at the very time the Final Rule was issued, the U.S. government was actively involved in efforts to find a way to return $23 million in frozen BDA accounts to North Korean customers, an effort that was complicated by the fact that BDA no longer had correspondent accounts with foreign banks through which to transfer funds. Thus, FinCEN purported to base the Final Rule on alleged activities that had occurred prior to any notice to BDA — or the financial world — that dealings with North Korea would be treated as inherently suspect and at a time when the U.S. government's own actions undermined the credibility of that position.

48. FinCEN also stated for the first time in the Final Rule that it had concerns about the ownership of BDA, claiming that there was a "likelihood of recidivism upon the dissolution of the administrative committee," when control of the bank would be returned to its owners. This stood in stark contrast to FinCEN's statement in the Proposed Rulemaking that Delta Asia Group, the holding company which owned BDA, was not subject to the fifth special measure. *See* 70 Fed. Reg. at 55,218 n.5. Despite repeated requests to identify its specific concerns, FinCEN had never previously claimed that the ownership of the bank was a basis for imposition of special measures against BDA, nor had it given BDA's owners any reason or opportunity to

address such concerns.  FinCEN had no rational basis for its assertion about the potential for "recidivism."

### G.     The Petitions to Rescind

49.     Following the issuance of the Final Rule, BDA (under management of the Macau government's Administrative Committee) and Delta Asia Group and Mr. Au filed separate petitions seeking to rescind the rule.  BDA argued that the Final Rule was arbitrary and capricious, and violated BDA's procedural rights, because, among other things, (i) FinCEN failed to provide specific facts, evidentiary support, or source information for its allegations about illicit activity at the bank, (ii) FinCEN deprived BDA of the opportunity to comment meaningfully on the proposed rulemaking or to challenge the evidence, (iii) FinCEN ignored the evidence of remedial measures taken by BDA, and (iv) FinCEN failed to provide adequate notice of its concerns about BDA's ownership.

50.     The petition of Mr. Au and Delta Asia Group similarly argued that FinCEN had failed to provide adequate notice of its concerns about BDA's owners.  That petition also substantively addressed FinCEN's concerns about the potential for recidivism by (i) setting forth background on the broad range of BDA's banking activities that had no relationship to North Korea; (ii) explaining that BDA and its owners had acted diligently and responsibly in addressing historical counterfeiting concerns; (iii) explaining why BDA had believed in good faith that its North Korean business was routine and innocent; (iv) explaining that BDA's historical AML procedures had been largely consistent with the regulatory requirements then in effect in Macau and did not demonstrate a disregard for money laundering concerns; and (v) explaining that there was no basis for FinCEN's concerns about "recidivism" by BDA's owners because both Mr. Au and Delta Asia Group were committed to taking and maintaining remedial measures to address FinCEN's concerns, including but not limited to a permanent

cessation of North Korean-related business and the continuation and further strengthening of AML improvements.

### H.    FinCEN's Denials

51.    By letters dated September 21, 2007, FinCEN denied both petitions to rescind the Final Rule.  With respect to BDA's petition, FinCEN asserted that it was entitled to rely on unsourced classified information in reaching its conclusions, that it had considered BDA's remedial measures but found them outweighed by other factors, and that FinCEN's concerns about BDA's owners were not a separate ground for the Final Rule but related to the general conclusions alleged in the Findings.

52.    With respect to the petition of Mr. Au and Delta Asia Group, FinCEN reiterated its conclusion that BDA historically had failed to engage in sufficient due diligence to protect against illicit activity, even in the absence of evidence of actual money laundering.  FinCEN also asserted that BDA knew or should have known that its North Korean-related customers were at high risk for engaging in illicit activities and that BDA was "at least used to" facilitate money laundering, "whether or not BDA and its owners acted in good faith."  Again, FinCEN did not identify any specific illicit conduct that had actually been facilitated by or through accounts at BDA, nor did it explain why it had arranged the return of funds to allegedly "high risk" customers if they were in fact the proceeds of illegal activity.

53.    Both denial letters noted that "FinCEN would be willing to revisit the Final Rule in the future if it becomes aware of material changes in the totality of circumstances relating to BDA, including, but not limited to, the concerns expressed in the Rulemaking Documents."

### I.    BDA's Current Operations

54.    In September 2007, the Macau government returned control of BDA to Delta Asia Group, stating in a press release that there had been a "remarkable improvement made in the

Bank's management."  Notwithstanding the severe operational losses suffered by the bank, BDA's owners remained committed to its survival and it has continued to operate in Macau with a focus on community banking and local clients, including many schools and churches who are attracted to BDA in part due to its long-standing refusal to provide corporate banking services to the now-burgeoning casino industry.

55.     Since September 2007, BDA's owners have devoted substantial resources to continued strengthening of the bank's corporate governance structure and AML compliance programs.  BDA retained professional management to run its major departments, and reconfigured its board to include four independent outside directors with notable banking and/or accounting experience.  BDA has substantially strengthened its AML compliance program and invested in state-of-the-art AML software to assist in that effort.  BDA accomplished these goals while struggling under the uncertainties and constraints resulting from the imposition of the Final Rule, which severely limit BDA's prospects for future growth and thus make it difficult to recruit experienced professional staff and management.

56.     On or about November 16, 2010, BDA filed a petition with FinCEN to repeal the Final Rule, demonstrating that material changes in the totality of circumstances since the promulgation of the Final Rule justified its repeal.  FinCEN has yet to act on that petition, and the petition is not at this time the basis for the claims in this action.  Plaintiffs reserve the right to amend this Complaint if FinCEN denies the petition or fails to act on it.

## CLAIMS

### Count I:  APA — Agency Action Without Observance of Procedure Required by Law

57.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

58. Defendants failed to provide any effective advance notice that the United States government would regard any business with North Korean customers as inherently suspect or inappropriate, or that financial institutions dealing with such customers could be cut off from the U.S. financial system.

59. Defendants knew and intended that publication of the Finding would have a severe, immediate impact on BDA's business. BDA had no advance notice of the alleged "concerns" stated in the Finding, nor any meaningful opportunity to address FinCEN's previously undisclosed concerns before the impact of the Finding was suffered.

60. Defendants failed to provide adequate notice and a meaningful opportunity to respond to their alleged concerns about the past and potential future conduct of BDA and its owners.

61. Defendants failed and improperly refused (a) to provide sufficient specificity regarding Plaintiffs' alleged involvement in illicit activity to permit a meaningful opportunity to comment thereon, (b) to disclose the evidence on which its allegations were based, or to permit Plaintiffs a meaningful opportunity to challenge such evidence. Had Defendants observed the procedures required by law, Plaintiffs would have demonstrated that Defendants' alleged concerns were unfounded.

62. For all these reasons, the Final Rule was adopted without observance of procedure required by law and must therefore be set aside. 5 U.S.C. § 706(2)(D).

**Count II: APA — Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, Otherwise Not In Accordance with Law, and in Excess of Statutory Authority**

63. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

64.     Defendants failed to provide advance notice that doing business with North Korean customers could subject Plaintiffs and others to agency action.

65.     Defendants abused their discretion by arbitrarily targeting one small bank to send a message to the worldwide financial community about an unstated policy against doing business with North Korea, notwithstanding express regulatory authorization for such business.

66.     Defendants had an insufficient evidentiary basis for the Finding and the Final Rule, including for the conclusions that BDA was an institution of primary money laundering concern and that BDA's owner presented a likelihood of "recidivism."

67.     Both the Finding and the Final Rule arbitrarily departed from the Defendants' prior decisions and practices under § 5318A.

68.     Defendants relied on improper considerations not authorized by law in imposing the Final Rule and fifth special measure.

69.     For all these reasons, the Final Rule is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or in excess of statutory jurisdiction, authority or limitations, or short of statutory right, and must therefore be held unlawful and set aside.  5 U.S.C. § 706(2)(A), (C).

### Count III:  Violations of Due Process

70.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

71.     Defendants deprived BDA of property, including correspondent accounts in the United States, without due process of law.

72.     Section 311 fails to provide adequate specificity as to the criteria for designating a financial institution as being "of primary money laundering concern" and for the imposition of

the fifth special measure, and it provides the Department overly broad discretion in making those determinations.  By virtue of this grant of standardless authority to the Department, Section 311 is unconstitutionally vague.

73.     For these reasons, the adoption of the Final Rule was contrary to constitutional right, power, privilege, or immunity, and the Final Rule must therefore be set aside.  5 U.S.C. § 706(2)(B).

## Count IV:  Unconstitutional Delegation

74.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

75.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const., art. I, § 1.

76.     By virtue of its grant of standardless authority to the Department, and its lack of an intelligible principle to which the Department is directed to conform in the exercise of that authority, Section 311 unconstitutionally delegates legislative power to the Executive Branch.

77.     As a result, the adoption of the Final Rule was contrary to constitutional right, power, privilege, or immunity, and the Final Rule must therefore be set aside.  5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court issue judgment in its favor and against defendants and issue the following relief:

A.     An order and judgment holding unlawful and setting aside 31 C.F.R. § 103.193.

B.     Costs and attorneys' fees pursuant to any applicable statute or authority.

C.     An award of such other relief that the Court may deem just and proper.

Dated:  March 14, 2013

Respectfully submitted,

 /s/ Mary Ellen Powers
Mary Ellen Powers (D.C. Bar No. 334045)
Timothy J. Finn (D.C. Bar. No. 963751)
Christian G. Vergonis (D.C. Bar No. 483293)
Henry Klehm III
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939
(202) 626-1700 (fax)

*Counsel for Plaintiffs*